UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Scrappost, LLC,

    Plaintiff/Counter-Defendant

                                 Case No. 14-14761

v.

                                 Hon. Sean F. Cox

Peony Online, Inc.,

    Defendant/Counter-Plaintiff
_____/

## OPINION & ORDER
## GRANTING SCRAPPOST'S MOTION FOR SUMMARY JUDGMENT (Doc. # 52) RE: PEONY'S COUNTER-CLAIM

This case involves a dispute between two companies that publish pricing information relating to the scrap metal industry. Defendant/Counter-Plaintiff Peony Online Inc. ("Peony") alleges that Plaintiff/Counter-Defendant Scrappost, LLC ("Scrappost") wrongfully obtained Peony's publications and subsequently solicited Peony's subscribers to also become subscribers of Scrappost. Peony's counter-claim includes claims for tortious interference, unfair competition, unjust enrichment and misappropriation of hot news.

Currently before the Court is Scrappost's Motion for Summary Judgment. The motion has been fully briefed by the parties. The Court finds that oral argument would not significantly aid in the decisional process and therefore orders that the instant motion will be decided upon the briefs. *See* E.D. Mich. LR 7.1(f). The Court shall **GRANT** Scrappost's Motion for Summary Judgment for the reasons that follow.

### BACKGROUND

**A.**     **Factual Background**

1

**The Parties**

Peony is in the business of publishing pricing information relating to the scrap metal industry. Since 1993, Peony has offered its customers a Consumer Broker Exporter's ("CBE") report. (Scrappost's Stmt. ¶ 11; Peony's Stmt. ¶ 11). The CBE report is a single-page, daily report that contains 70 price quotes for several scrap metal varieties. (Scrappost's Stmt. ¶ 11; Peony's Stmt. ¶ 11).

The CBE report's format has not changed since its creation. (Scrappost's Stmt. ¶ 13; Peony's Stmt. ¶ 13). The CBE report is not interactive and Peony subscribers do not directly contribute to the report. (Scrappost's Stmt. ¶ 14; Peony's Stmt. ¶ 14). Peony publishes data from a subscriber if it deems the metal trader suitable for the service. (Scrappost's Stmt. ¶ 17; Peony's Stmt. ¶ 17). The purpose of the CBE report is to provide buyers and sellers of scrap metal with price information. (Scrappost's Stmt. ¶ 16; Peony's Stmt. ¶ 16).

The CBE report can be accessed by Peony subscribers through fax or email. (Scrappost's Stmt. ¶ 12; Peony's Stmt. ¶ 12). In 2009, Peony began providing the CBE report on its website. (Scrappost's Stmt. ¶ 18; Peony's Stmt. ¶ 18).

Scrappost operates a website that provides "an online marketplace for scrap [metal] dealers, brokers and consumers – offering a single destination to easily get scrap market news, commodity pricing and real time offers to buy/sell scrap materials." (Scrappost's Stmt. ¶ 1; Peony's Stmt. ¶ 1). Scrappost considers itself to be a "Craigslist" type of business for the scrap metal industry. (Scrappost's Stmt. ¶ 2; Ex. B to Scrappost's Stmt., at 25).

The purpose of the Scrappost business is to connect scrap metal buyers and sellers in order to enable the direct transaction of business in one forum. (Scrappost's Stmt. ¶ 3; Peony's

2

Stmt. ¶ 3). Scrappost's business model is "software as a subscription," wherein Scrappost derives revenue from the annual or monthly subscription fees it charges to users of its website. (Scrappost's Stmt. ¶ 4; Ex. D to Scrappost's Stmt., at 163).

Peony's co-presidents acknowledged that the pricing services provided by both Scrappost and Peony are not unique and that other pricing services exist in the scrap metal industry. (Ex. G to Scrappost's Stmt., at 229; Ex. I to Scrappost's Stmt., at 34).

Scrappost's website went live in early September 2013. (Scrappost's Stmt. ¶ 5; Peony's Stmt. ¶ 5). Matthew Newman runs Scrappost's day-to-day operations. (Scrappost's Stmt. ¶ 6; Peony's Stmt. ¶ 6). According to Scrappost, its employees sought to obtain new subscribers by: (1) searching for scrap metal companies on the internet and cold-calling them or emailing them; (2) networking with scrap traders at conventions; (3) contacting scrap traders in Scrappost owner Michael Bassirpour's rolodex; and (4) contacting members of trade associations. (Scrappost's Stmt. ¶ 7).

Newman solicits postings to the Scrappost website from subscribers by contacting Scrappost subscribers throughout the day and asking if they wish to post materials for sale on the Scrappost website. (Scrappost Stmt. ¶ 8; Peony Stmt. ¶ 8). In June 2015, Scrappost began to broker scrap metal transactions directly. (Scrappost's Stmt. ¶ 10; Peony's Stmt. ¶ 10).

**Events Giving Rise To Instant Action**

According to Peony, Scrappost obtained its subscribers by having access to Peony reports. Newman testified that during the time frame that he was soliciting subscribers, he periodically received email attachments containing Peony reports from Mike Comisso (a former owner of Scrappost), Mike Bassirpour (Scrappost owner) and Dale Turken (of Scrapgo). (Ex. 1

to Peony Resp., at 125). The reports were not sent on a regular basis and there is no evidence as to how the information in the reports was used.

On October 2, 2013, Peony sent a letter to Scrappost asking Scrappost to "stop immediately receiving the Peony report, using in any manner the Peony report or any information contained within the report." (Ex. 7 to Doc. #55). The letter further asked Scrappost to stop targeting or soliciting Peony's contributors.

In 2014, Peony created the Instant Quote ("IQ") service. (Scrappost's Stmt. ¶19). IQ provided customers with the ability to directly post scrap metal for sale. (Scrappost's Stmt. ¶ 19). In order to subscribe to the IQ service, subscribers were required to sign an exclusivity provision contained within IQ's subscriber agreement. The exclusivity provision reads:

> Subscriber agrees to list his or her materials and prices on Peony Instant Quote exclusively. Subscriber agrees not to list any prices in a similar fashion (i.e., along with his or her name, company name and contact information) on any other web sites or price reports, except on Peony.s [sic] CBE and subscriber.s [sic] own web site, during his or her subscription to Peony.s [sic] CBE/Instant Quote."

(Ex. L to Scrappost Br.).

Peony's co-president, Ganru Ge, testified that Scrappost coming into existence was one reason IQ was created, however, the main reason was to better serve Peony's subscribers. (Ex. G to Scrappost's Stmt. at 194). Ganru Ge also testified that one of the reasons for the exclusivity provision was to prevent third-parties from trying to enter into relationships with Peony customers. (*Id*. at 211). Peony co-president Vivian Ge testified that Peony has never taken any action against Peony subscribers for violating its exclusive listing provision and that Peony would never take such action. (Scrappost's Stmt. ¶ 21; Peony Stmt. ¶ 22).

Matthew Newman was first made aware of the exclusivity provision Peony had with its

subscribers in April 2014. (Ex. 6 to Peony's Resp. at 12-13). Scrappost claims that its subscribers complained that Peony called them advising that they were not allowed to advertise on both Scrappost and Peony's sites. (Ex. B. to Scrappost's Stmt. at 135-36). Once made aware of the exclusivity provision, Scrappost continued to run its business as it normally did. (Ex. 1 to Peony Resp. at 101). Specifically, Newman testified as to the following:

> Q. Okay. After that date, did you continue soliciting price information from your subscribers who had told you that Peony told them that they couldn't list with you?
>
> A. Yes, they were my subscribers. Their agreements with Peony have nothing to do with me. Or the Scrappost.

(*Id*. at 134).

One such conversation took place on February 16, 2015, when Jeff Zhai, of Three Win Metal (a subscriber of both Peony and Scrappost), initiated an email chat with Newman regarding his listing on the Scrappost site. (Ex. 7 to Peony Resp., Feb. 16, 2015 Email Chat). Zhai advised that he wanted to change the contact name on his Scrappost listing per Peony's request that he either delete all materials listed on Scrappost or change the contact name. Zhai further stated that he was violating his agreement with Peony by listing on Scrappost. Newman initially responded that there is nothing Peony can do and assured Zhai not to worry about it. Zhai responded that he no longer wanted to receive calls from Peony. Newman concluded by asking for clarity as to what Peony was advising so that he could mark down the reason for the change in his notes.

**B. Procedural Background**

**Scrappost Complaint**

Scrappost originally filed this action on December 17, 2014, based upon diversity of

citizenship. (Doc. #1). Scrappost filed an amended complaint on January 14, 2015. (Doc. #5, Scrappost Am. Compl.). Peony is the only named Defendant in the complaint. Scrappost alleges the following claims against Peony: (1) Count I - Business Defamation; (2) Count II - Injurious Falsehood; and (3) Count III - Intentional Interference With Business Expectancy. Scrappost seeks monetary relief for damages allegedly sustained.

### Peony Counterclaim

Peony's position is that Scrappost entered the marketplace in 2013 and began to mimic Peony's reports and target Peony's subscriber and contributor base. Peony filed a counter-claim on March 6, 2015. (Doc. #14, Peony Counterclaim). Scrappost is the only named Defendant. Peony alleges the following claims against Scrappost: (1) Count I - Tortious Interference with Contract and Prospective Economic Advantage; (2) Count II - Unfair Competition; (3) Count III - Unjust Enrichment; and (4) Count IV - Misappropriation of Hot News. Peony seeks monetary and injunctive relief.

### Scrappost's Motion For Summary Judgment

The parties have each filed motions for summary judgment. The parties' motions will be addressed in separate Opinions & Orders. The instant Opinion & Order addresses Scrappost's motion, which seeks dismissal of Peony's counter-claim. (Doc. #52, Scrappost Br.). Peony opposes the motion. (Doc. #64, Peony Resp.).

## STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1984), *quoting* FED. R. CIV. P. 56(c).

"The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case." *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). "The moving party may meet its burden by showing that the nonmoving party lacks evidence to support an essential element of its case." *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1389 (6th Cir. 1993). The plaintiff must come forth with more than a "mere scintilla of evidence" in support of his or her position in order to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). "The court must view the evidence, all facts, and any inferences that may permissibly be drawn from the facts in the light most favorable to the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

Peony asserts four causes of action in its counter-claim: (1) tortious interference with contract and prospective economic advantage; (2) unfair competition; (3) unjust enrichment; and (4) misappropriation of "hot news." (Peony Counterclaim). Scrappost challenges each. The Court concludes that each of Peony's claims fail for the reasons outlined below.

**A.     Tortious Interference With Contract & Prospective Economic Advantage**

In Michigan, tortious interference with a contract is a distinct cause of action from tortious interference with a business relationship or expectancy. *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich. App. 83, 89 (2005). Here, Peony's Count I ("Tortious Interference with Contract and Prospective Economic Advantage") appears to

7

conflate the two claims as one. Regardless of which claim Peony intends to bring, both claims fail.

### 1. Tortious Interference with Contract

The elements of tortious interference with a contract under Michigan law are: "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Bailey v. Scoutware, LLC*, 2012 WL 2711458, at *7 (E.D. Mich. July 9, 2012) (quoting *Health Call of Detroit*, 268 Mich. App. at 89-90). "Tortious interference with contract exists when a third party to a contract, knowing of the contract, intentionally and wrongfully induces a breach of the contract which results in damage to a non-breaching party." *Fidelity Nat. Title Ins. Co. v. Title First Agency, Inc.*, 2008 WL 4371838, at *7 (E.D. Mich. Sept. 22, 2008) (citing *Mino v. Clio School District*, 255 Mich. App. 60, 78 (2003)).

Scrappost argues that Peony's claim fails because it cannot establish an unjustified instigation of a breach of contract and because Peony cannot establish damages resulting from Scrappost's alleged tortious interference. The Court agrees.

#### a. Unjustified Instigation of Breach

"'One who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.'" *CMI Int'l., Inc. v. Internet Int'l. Corp.*, 251 Mich. App. 125, 131 (2002) (quoting *Feldman v. Green*, 138 Mich. App. 360, 378 (1984)). "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Prysak v. R.L. Polk Co.*, 193 Mich. App. 1, 12-13 (1992).

"If the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *CMI Int'l.*, 251 Mich. App. at 131. "Mere interference for the purpose of competition is not enough." *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich. App. 361, 377 (1984). Rather, the defendant must have done something illegal, unethical, or fraudulent. *Dalley v. Dykema Gossett*, PLLC, 287 Mich. App. 296, 324 (2010).

Here, Peony argues that Scrappost tortiously interfered with Peony's contracts by soliciting "Peony contributors who had entered into the exclusive listing agreement to list information on the Scrappost website with knowledge of the exclusivity provision and telling them to ignore the exclusivity agreements." (Peony Resp. at 5). As evidence of Scrappost's tortious interference, Peony points to the transcript of the February 16, 2015 email chat between Matthew Newman, of Scrappost, and Jeff Zhai, of Three Win Metal. Peony's argument is without merit for several reasons.

First, the February 16, 2015 email chat does nothing to bolster Peony's point. Instead, the chat illustrates that Three Win Metal was already listing on both sites and was therefore *already* in breach of the exclusivity provision at the time that Zhai reached out to Newman.

This brings the Court to its next point: Peony's entire argument presumes that it is Scrappost that *instigated* the breach of the exclusivity provision. Most fatal to Peony's claim, however, is the undisputed fact that Peony created its IQ service and the exclusivity provision months *after* Scrappost had gone live and after Scrappost had acquired subscribers. Even Peony's own co-president testified that Scrappost's coming into existence was one of the reasons why Peony IQ was created. (Ex. G to Pl.'s Br., at 194). In essence, the breach of contract that

9

Peony complains of is a result of Peony's own doing.

Further, Peony has not pointed to any admissible evidence[1] establishing that Scrappost did anything that was illegal, unethical or fraudulent to induce or coerce Peony subscribers to breach their exclusivity provision with Peony. Scrappost's continued solicitation of its subscribers, without more, is not illegal, unethical or fraudulent. As such, there is no evidence that Scrappost engaged in any actions that could be construed as wrongful per se or as lawful acts undertaken with malice.

      **b.    Damages**

Even if Peony could establish tortious interference, Peony fails to establish that it has suffered damages *as a result of* Scrappost's interference. Peony advances only one argument in support of its claim that it has been damaged as a result of Scrappost: "[a] review of Peony's financial records shows a decrease in revenue from year to year after Scrappost entered the marketplace." (Peony's Resp. at 7). This argument is not supported by any substantive analysis and is without merit.

First, there is absolutely no evidence that Peony's decrease in revenue is a *result of*

---

[1] To the extent that Peony relies upon exhibit 10 (which is identified as "Peony notes of conversations with contributors") as evidence of Scrappost listing pricing information without permission, it may not do so. These unsworn, handwritten notes are hearsay and Peony has not argued that this exhibit satisfies any exception to the general proscription against the admission of hearsay. Furthermore, even if such an exception applied, these unsworn handwritten notes are still inadmissible as they are not properly authenticated. The Sixth Circuit has long held that to be considered in support of a motion for summary judgment, evidence must be properly authenticated. *See e.g., David A. Flynn, Inc. v. General Motors Acceptances Corp.*, 345 Fed. App'x 974, 978-79 (6th Cir. 2009). The Federal Rules of Evidence provide that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Civ. P. 901(a). Here, Peony has submitted no such evidence.

Scrappost's alleged misconduct. It is undisputed that Peony and Scrappost are not the only companies in the scrap metal industry publishing price information. The mere fact that Peony's revenue has decreased since Scrappost went live in 2013 is coincidental, at best. Even Peony's co-president, Ganru Ge, testified that the scrap metal market has become less robust and that he did not know why there was a decline in Peony's subscription revenue.

Nor has Peony pointed to any evidence establishing that it has lost subscribers as a result of Scrappost's conduct. In fact, Peony has admitted that it will not enforce the exclusivity provision against its subscribers.

### 2. Tortious Interference With Economic Advantage

To prevail on a tortious interference with economic advantage claim (*i.e.* business relationship or expectancy), Peony must establish that: "(1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional inference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted." *Health Call of Detroit v. Atrium Home & Health Care Services, Inc.*, 268 Mich. App. 83, 89-90 (Mich. Ct. App. 2005) (internal citations omitted).

Here, Scrappost argues that Peony's claim fails for the same reasons its tortious interference with a contract claim fails: Peony is unable to establish that Scrappost induced or caused a breach or termination and Peony is unable to establish resulting damage. The Court agrees.

### a. Intentional Interference Inducing Breach

Peony's argument–that Scrappost intentionally interfered and induced a breach of the exclusivity provision by soliciting Peony IQ subscribers–is without merit for the same reasons advanced above. Namely, Peony has not established that Scrappost *induced* a breach of Peony's contracts with its IQ subscribers.

        **b.**        **Resulting Damage**

Peony's claim also fails because Peony has not established damages resulting from Scrappost's alleged interference. Again, as explained above, the mere fact that Peony's revenues decreased after Scrappost entered the marketplace is insufficient to establish that Peony has been damaged as a *result of* Scrappost. This argument is speculative and coincidental, at best.

**B.**        **Unfair Competition**

In Michigan, unfair competition "prohibits unfair and unethical trade practices that are harmful to one's competitors or to the general public." *ATCO Indus., Ins. v. Sentek Corp.*, 2003 WL 21582962, at *3 (Mich. Ct. App. July 10, 2003). Unfair competition "ordinarily consists in the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares and thereby obtaining for himself the benefits properly belonging to his competitor." *Clipper Belt Lacer Co. v. Detroit Belt Lacer Co.*, 223 Mich. 399, 406 (1923).

The "gist of [an] ... unfair competition case ... is that the public is so misled that the plaintiff loses some trade by reason of the defendant's deception." *Revlon, Inc. v. Regal Pharmacy, Inc.*, 29 F.R.D. 169, 174 (E.D. Mich. 1961). "Each unfair competition case ... is based upon the principles of common business integrity. The term unfair competition may encompass any conduct that is fraudulent or deceptive and tends to mislead the public." *ATCO*,

2003 WL 21582962, at *3 (internal quotation marks and citation omitted).

Here, Peony claims that Scrappost's conduct has violated fair business practices. Specifically, Peony argues that:

> The record facts show that Scrappost entered a business after having its founders subscribe to Peony's publications for years and that when it learned of the exclusive agreement between Peony and its contributors it chose to simply ignore those agreements. This conduct is not the type of fair competition contemplated by Michigan law and gives rise to an unfair competition claim."

(Peony's Resp. at 8). First, the Court notes that Peony's argument is lacking in substantive analysis. Peony has not cited any authority that would support a finding of unfair competition under the facts alleged here.

Moreover, in making this argument, Peony mischaracterizes the facts. At the time that Scrappost entered the marketplace, an exclusive agreement between Peony and its contributors did not exist. In fact, the record establishes that Peony created the exclusivity provision, at least in part, as a response to Scrappost. As such, Peony has not established any wrongful interference or inducement on Scrappost's part.

Nor has Peony pointed to any evidence establishing that Scrappost engaged in deceptive or fraudulent activity resulting in harm to the general public or Peony. In fact, Peony fails to identify any harm that it suffered as a result of Scrappost's alleged misconduct. As such, Peony's unfair competition claim fails.

**C.     Unjust Enrichment**

In order to sustain an unjust enrichment claim under Michigan law, a plaintiff must establish: "(1) the receipt of a benefit by the defendant from the plaintiff and (2) and inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Morris Pumps*

*v. Centerline Piping, Inc.*, 273 Mich. App. 187, 195 (2006); *see also First Presbyterian Church of Ypsilanti v. H.A. Howell Pipe Organs, Inc.*, 2010 WL 419972, at *9 (E.D. Mich. Feb. 1, 2010). "Whether a claim for unjust enrichment can be maintained is a question of law." *Morris Pumps*, 273 Mich. App. at 193.

Here, Peony's unjust enrichment claim is premised upon the fact that Scrappost had access to Peony's CBE and IQ reports. With such access, Peony argues that "a jury could conclude that Scrappost then sought to obtain price listings from the companies identified in the Peony reports or simply took the pricing information from Peony's reports." (Peony's Resp. at 9). Peony concludes that "Scrappost got a head start by having access to the information published by Peony." (*Id*). Peony's argument is not persuasive.

While it is true that Scrappost had occasionally received Peony's reports, there is no evidence establishing how Scrappost used the information contained in the reports. Namely, there is no evidence that Scrappost copied the price information from Peony's reports. Nor is there any evidence that Scrappost obtained contributors by having access to Peony's reports. To this end, Scrappost correctly points out that the identities of Peony's subscribers were not confidential. (*See* Ex. M to Doc. # 52). Peony has therefore failed to establish any benefit conferred by Scrappost as a result of Peony's efforts. Additionally, Peony has failed to establish how it has suffered an inequity as a result of any alleged benefit. For these reasons, Peony's unjust enrichment claim fails.

**D.     Misappropriation of Hot News**

In Count IV of its counter-claim, Peony asserts a claim for "Misappropriation of Hot News." At the outset, the Court notes that it has located no authority to support a "hot news"

misappropriation claim in Michigan. Peony similarly fails to cite a single case indicating that Michigan courts have adopted "hot news" misappropriation causes of action. The Court could therefore dismiss Peony's claim on this basis. However, even assuming that Peony has alleged a viable claim under Michigan law, Peony's misappropriation claim still fails.

In support of its misappropriation claim, Peony cites the Second Circuit's decision in *NBA v. Motorola*, Inc., 105 F.3d 841, 845 (2nd Cir. 1997), which sets forth the "hot news" doctrine's five-part test: "(i) a plaintiff generates or gathers information at a case; (ii) the information is time-sensitive; (iii) a defendant's use of the information constitutes free riding on the plaintiff's efforts; (iv) the defendant is in direct competition with a product or service offered by the plaintiffs; (v) the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened." *Id.*

Measured against the five factors outlined in *NBA*, Peony concludes that its "hot news claim" withstands summary judgment because: (1) Peony gathers price information at a cost; (2) the price information is time-sensitive; (3) Scrappost appears to have obtained price information from Peony's reports because Scrappost did not have permission from companies to list their pricing information; (4) Peony and Scrappost are in direct competition; and (5) allowing Scrappost to "free-ride" on the efforts of Peony would take away Peony's incentive to produce its report. (Peony Resp. at 10).

At the heart of Peony's claim is the allegation that Scrappost copied price information from Peony's publications and misappropriated this information for its own commercial gain. First, Peony disregards the fact that it is Scrappost's subscribers, not Scrappost itself, that list

15

price information on the Scrappost website. And to the extent that Peony suggests that Scrappost must have copied price information from Peony reports because the information on Scrappost's website was listed without the consent of Peony's subscribers, this argument is not supported by any admissible evidence.[2] In sum, Peony has not offered evidence to support the allegation that Scrappost was "free-riding" on the efforts of Peony.

Second, as Scrappost persuasively points out, the data allegedly misappropriated by Scrappost was already published by the time Scrappost obtained it. As such, the information that Scrappost obtained was stale – not time-sensitive. Third, Peony has not established how it was damaged as a result of Scrappost's alleged "free-riding."

## CONCLUSION

For the foregoing reasons, the Court shall **GRANT** Scrappost's Motion for Summary Judgment as to Peony's counter-claim.

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: February 22, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 22, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager

---

[2] Peony relies on the unsworn, handwritten notes of a Peony employee detailing conversations that the employee allegedly had with Peony subscribers about the price information on Scrappost's site. These unsworn notes have not been properly authenticated.