UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Scrappost, LLC,

      Plaintiff/Counter-Defendant

                                   Case No. 14-14761

v.

                                   Hon. Sean F. Cox

Peony Online, Inc.,

      Defendant/Counter-Plaintiff
_____/

## OPINION & ORDER GRANTING IN PART AND DENYING IN PART PEONY'S MOTION FOR SUMMARY JUDGMENT (Doc. #55)

This case involves a dispute between two companies that publish pricing information relating to the scrap metal industry. Plaintiff Scrappost, LLC ("Scrappost") asserts that Defendant Peony Online Inc. ("Peony") fraudulently accessed Scrappost's private listings and subsequently harassed subscribers until they agreed to stop subscribing to Scrappost. Scrappost's second amended complaint includes claims for business defamation, injurious falsehood, intentional interference with business expectancy, and fraudulent misrepresentation.

Currently before the Court is Peony's Motion for Summary Judgment. (Doc. # 55, Peony Br.). Scrappost has responded to the motion (Doc. # 63, Scrappost Resp.), and Peony has replied. (Doc. # 66, Peony Reply). The Court finds that oral argument would not significantly aid in the decisional process and therefore orders that the instant motion will be decided upon the briefs. *See* E.D. Mich. LR 7.1(f).

For the reasons that follow, the Court shall **GRANT IN PART and DENY IN PART** Peony's Motion for Summary Judgment. The Court shall GRANT Peony's motion to the extent

1

that it seeks dismissal of Count I (business defamation), Count II (Injurious Falsehood), and Count IV (Fraudulent Misrepresentation).  However, Peony's motion is DENIED to the extent that it seeks dismissal of Count III (Tortious Interference with Business Expectancy).

## BACKGROUND

**A.     Factual Background**[1]

### 1.     The Parties

The purpose of the Scrappost business is to connect scrap metal buyers and sellers in order to enable the direct transaction of business in one forum.  (Doc. #53 at ¶ 3; Doc. #65 at ¶ 3).  Scrappost's website, which went live in September 2013, provides "an online marketplace for scrap [metal] dealers, brokers and consumers – offering a single destination to easily get scrap market news, commodity pricing and real time offers to buy/sell scrap materials."  (Doc. # 53 at ¶ 1; Doc. # 65 at ¶ 1).  Scrappost considers itself to be a "Craigslist" type of business for the scrap metal industry.  (Ex. B to Doc. # 53 at 25).

Peony is also in the business of publishing pricing information relating to the scrap metal industry.  Peony has offered its subscribers a Consumer Broker Exporter's ("CBE") report since 1993.  (Doc. # 53 at ¶ 11; Doc. # 65 at ¶ 11).  The CBE report is a single-page, daily report that contains 70 price quotes for several scrap metal varieties.  The purpose of the CBE report is to provide buyers and sellers of scrap metal with price information.  (Doc. # 53 at ¶ 16; Doc. # 65 at ¶ 16).

In 2014, Peony began offering the Instant Quote ("IQ") service.  Similar to Scrappost,

---

[1] Pursuant to this Court's Practice Guidelines, Peony has filed a Statement of Material Facts Not in Dispute (Doc. # 56, Peony Stmt.) and Scrappost has filed a Counter-Statement of Disputed Facts (Doc. # 62, Scrappost Stmt.).

Peony IQ provides subscribers with the ability to directly post scrap metal for sale.  In order to subscribe to the IQ service, subscribers were required to sign an exclusivity provision contained within IQ's subscriber agreement.  (Peony's Stmt. ¶¶ 3-4; Scrappost's Stmt. ¶¶ 3-4).  The exclusivity provision reads:

> Subscriber agrees to list his or her materials and prices on Peony Instant Quote exclusively.  Subscriber agrees not to list any prices in a similar fashion (i.e., along with his or her name, company name and contact information) on any other web sites or price reports, except on Peony.s [sic] CBE and subscriber.s [sic] own web site, during his or her subscription to Peony.s [sic] CBE/Instant Quote."

(Ex. 2 to Peony Br.).

Peony's co-president, Vivian Ge, has testified that Peony has not taken any action against Peony subscribers for violating the exclusive listing provision and that Peony would never take such action.  (Ex. A to Scrappost Resp. at 65-69).  Moreover, Peony co-president Ganru Ge has testified that Scrappost coming into existence was one reason why Peony IQ was created.  (Ex. B to Scrappost's Resp. at 194).  Ganru Ge also testified that one of the reasons for the exclusivity provision was to prevent third-parties from trying to enter into relationships with Peony subscribers.  (*Id*. at 211).

### 2. Events Giving Rise To Instant Action

According to Scrappost, Peony relies on its exclusivity provision as pretext to call and harass Scrappost subscribers until the subscribers stop listing on Scrappost's website. Peony admits that it called Peony subscribers that were also listing on Scrappost's website.  However, Peony asserts that it was justified in taking the actions that it did because Peony believed that Scrappost was stealing Peony's information/subscribers.

In order to monitor Scrappost's private listings, and to contact Peony subscribers who

were also listing on Scrappost, Peony obtained access to the non-public portion of Scrappost's website by asking Jimmy Chen (owner of Greentex) to subscribe to Scrappost. (Ex. 13 to Peony's Br. at 53-54). Greentex would then provide Peony with the daily emails that Scrappost sent to Greentex. (Ex. 1 to Peony's Br. at 183-84). These emails contained customer contact information and price information. (*Id*. at 184).

Peony's Zoltan Badau began receiving the Scrappost emails on a daily basis. (Ex. K to Scrappost Resp. at 54). Badau testified that he was responsible for checking which of Peony's subscribers were also listing on Scrappost's website. (*Id*. at 55). Badau explained that IQ subscribers were subject to an "exclusive contract" and that their listings on Scrappost constituted a breach of the contract. (*Id*. at 57). Although he could not recall the details of his conversations, Badau admitted that it was his practice to continue to call Peony IQ subscribers until the subscribers removed their listings from Scrappost's website. (*Id*. at 70-71). Badau acknowledged that there were some subscribers that he called anywhere from 5-10 times and some as many as 10 or more times. (*Id*. at 69-71).

In addition to IQ subscribers, Badau testified that he also called Peony CBE subscribers. (*Id*. at 66-68). These subscribers were not subject to any exclusivity provision, but he called to ensure that the subscribers were aware that their listings posted on Scrappost's website. (*Id*.). Peony stopped accessing the private listings in January 2016 because Scrappost terminated the Greentex account. (Ex. B to Scrappost Resp. at 186).

### 3.     MadDog's Acquisition of Scrappost

On October 31, 2015, MadDog Technology paid $200,000 to acquire a 50% ownership interest in Scrappost. (Peony Stmt. ¶ 14; Scrappost Stmt. ¶ 14). At the time of MadDog's

4

acquisition, Scrappost had approximately 500 subscribers. (Peony Stmt. ¶ 15; Scrappost Stmt. ¶ 15). After MadDog's acquisition, Scrappost's subscriber count fell by approximately 50%. (Peony Stmt. ¶ 22; Scrappost Stmt. ¶ 22).

An investigation into Scrappost's "market potential" was subsequently initiated. (Ex. 5 to Peony Br. at 58). Scrappost began a "calling campaign" to determine whether or not Scrappost would want to start hiring salespeople or whether it should invest first. (*Id.*). With respect to Scrappost's brokerage offering, Scrappost concluded that it needed to "innovate." (*Id.* at 65). With respect to Scrappost's subscription offering, Scrappost concluded that it needed to determine the reason for, and effect of, Peony's actions. (*Id.*). The value in Scrappost's subscription potential was substantially reduced and Scrappost did not want to hire people to sell subscriptions while the instant lawsuit was pending. (*Id.* at 66). However, Scrappost still hired an additional employee to sell into the subscription market. (Ex. I to Scrappost Resp. at 40).

### 4.   Scrappost's Subscription Count

Scrappost's business model is "software as a subscription," wherein Scrappost derives revenue from the annual or monthly subscription fees it charges to users of its website. (Ex. D to Doc. # 53 at 163). Scrappost offers monthly or yearly subscriptions, however a majority of its paying subscribers subscribe on a month-to-month basis. (Ex. 3 to Peony's Br. at 19-21, 24). Scrappost has also offered free trials to subscribers.[2] (Ex. E to Scrappost Resp. at 61).

Scrappost alleges that it lost subscriptions as a result of Peony's actions. The following is an overview of Scrappost's year-to-year subscriber count. (*See* Ex. F to Scrappost Resp.).

---

[2] In so doing, Scrappost paid for subscriptions on a company credit card. (Ex. E to Scrappost Resp. at 61; Ex. 15 to Peony Br.).

Between September 2013 and September 2014, Scrappost's subscriber count grew from 0 to 306. (*Id*.).  Between September 2014 and September 2015, Scrappost's subscriber count grew from 306 to 501.  (*Id*.).  Between September 2015 and May 2016, Scrappost's subscriber count decreased from 501 to 304.  (*Id*.).  Since September 2013 through May 2016, Scrappost has had 766 subscription cancellations and it has experienced a cumulative "churn" (a term used to describe subscription cancellations) of 72%.  (*Id*.).

Matthew Newman testified that he spoke to some of Scrappost's former subscribers regarding their reasons for leaving Scrappost.[3]  Newman believes that the subscribers he spoke to stopped listing on Scrappost as a result of Peony's phone calls.  (Ex. 10 to Peony's Br. at 105). Newman also assumes that the subscribers he did not speak to left as a result of Peony.  (*Id*.).

Sanford Rosen, one of Scrappost's principals, testified that he believed the decline in subscriber count can be attributed to a number of things, including: a more difficult market and Peony's actions.  (Ex. 11 to Peony's Br. at 42-43).

### 5.    Damages

To support its claim for damages, Robert Cell (managing director of MadDog Technology) created a valuation summary as to Scrappost.  Cell claims that Scrappost's valuation has been eroded as a result of Peony's actions.  Scrappost's damages can be quantified in two ways: (1) the degradation of new customers who would have joined Scrappost but for Peony's conduct; and (2) the churn/loss of existing customers.  (Ex. I to Scrappost Resp. at 36).

Cell estimates that Scrappost would have reached 3,400 subscriptions, rather than 1,200

---

[3] To the extent that Scrappost relies upon the "Notes" column of Scrappost's Exhibit J to prove the content of Newman's conversations with subscribers, it may not do so.  The summary of Newman's conversations with former subscribers is inadmissible hearsay.

subscriptions, had Peony not interfered with Scrappost's business relationships.  (*Id*.).  Cell further estimates that 50-75% of Scrappost's churn is attributed to Peony, which resulted in a valuation loss of between $11.9 and $18.6 million.  (*Id*. at 36-37).

**B.**     **Procedural Background[4]**

Scrappost initiated the instant action on December 17, 2014.  (Doc. #1).  Scrappost's second amended complaint is the operative complaint in this case.  (Doc. # 12, Compl.).  Peony is the only named Defendant in Scrappost's complaint.  Scrappost alleges the following claims against Peony: (1) Count I - Business Defamation; (2) Count II - Injurious Falsehood; (3) Count III - Intentional Interference With Business Expectancy; and (4) Count IV - Fraudulent Misrepresentation.  Scrappost alleges that Peony's actions have caused "significant damages to Scrappost in lost revenue and lost customers." (Compl. at ¶ 22).  Scrappost seeks monetary relief for damages sustained.

Peony filed the instant Motion for Summary Judgment on June 20, 2016.  (Doc. # 55).  Peony seeks dismissal of Scrappost's complaint, arguing that Scrappost has failed to offer admissible evidence sufficient to raise a dispute of fact as to any of its claims.  Peony also argues that Scrappost's damages are impermissibly speculative.  Scrappost opposes Peony's motion.  (Doc. # 63).

**STANDARD**

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions,

---

[4] On March 6, 2015, Peony filed a counter-claim alleging claims for tortious interference, unfair competition, unjust enrichment and misappropriation of hot news.  (Doc. # 14).  Scrappost filed Motion for Summary Judgment, seeking dismissal of Peony's counter-claim, on June 20, 2016.  (Doc. # 52).  On February 22, 2017, this Court entered an Opinion and Order granting Scrappost's motion (Doc. # 85) and consequently dismissed Peony's counter-claim.  (Doc. # 86).

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1984), *quoting* FED. R. CIV. P. 56(c).

"The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case." *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). "The moving party may meet its burden by showing that the nonmoving party lacks evidence to support an essential element of its case." *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1389 (6th Cir. 1993). The plaintiff must come forth with more than a "mere scintilla of evidence" in support of his or her position in order to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). "The court must view the evidence, all facts, and any inferences that may permissibly be drawn from the facts in the light most favorable to the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

Scrappost's second amended complaint asserts the following counts against Peony: business defamation; injurious falsehood; intentional interference with business expectancy; and fraudulent misrepresentation. The Court concludes that Scrappost's claims for business defamation, injurious falsehood, and fraudulent misrepresentation fail. However, the Court finds that issues of fact exist as to whether Peony tortiously interfered with Scrappost's business relationships/expectancies. As such, the Court shall not grant summary judgment in Peony's favor as to this claim.

8

## A.      Business Defamation

In Count I of its amended complaint, Scrappost asserts a claim for business defamation. The elements of a defamation claim are as follows:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statements irrespective of special harm, or the existence of special harm caused by the publication.

*Gonyea v. Motor Parts Fed. Credit Union*, 192 Mich. App. 74, 76-77 (1991). These elements must be specifically pled, "including the allegations with respect to the defamatory words, the connection between the plaintiff and the defamatory words, and the publication of the alleged defamatory words." *Id.* The Court concludes that Scrappost has failed to offer admissible evidence of any defamatory statement. As such, Scrappost's business defamation claim must fail.

Here, Scrappost alleges that Peony's employee, Zoltan Badau, contacted Scrappost subscribers and made false and defamatory statements about Scrappost. Specifically, Matthew Newman testified that Scrappost subscribers informed him that Badau made the following statements to them: (1) that Scrappost was engaged in wrongdoing and in illegal conduct; (2) that Peony was actively involved in litigation with Scrappost/Peony had several lawsuits pending against Scrappost; and (3) that Scrappost had stolen Peony's information. (*See* Ex. 3 to Peony's Br. at 90-96).

The problem with Scrappost's reliance on Newman's testimony is that it is hearsay: Newman is testifying as to out-of-court statements made by Scrappost subscribers. It is well settled that hearsay evidence may not be considered on summary judgment. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999).

9

Scrappost unpersuasively attempts to remedy this by arguing that: (1) Peony has not made an "objection" to the material cited; (2) that the statement of a party opponent is not hearsay; and (3) that Badau "did not deny" that he made these statements. All three arguments are unavailing.

First, Federal Rule of Civil Procedure 56(c)(2) states that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The Court finds that Peony has sufficiently objected to the admission of Newman's testimony. (*See* Peony's Br. at. 8, 11-12).

Second, Scrappost's reliance on Federal Rule of Evidence 801(d)(2) is misplaced because it disregards which out-of-court statement is being introduced for its truth. Here, Scrappost is attempting to introduce its *subscribers'* out-of-court statements–through Newman–to implicate Peony. There are two sets of out-of-court statements at issue. First, there are the defamatory, out-of-court statements made by Badau to subscribers. Second, there are the out-of-court statements made by subscribers to Matthew Newman, which recounted Badau's statements. Even assuming that Rule 801(d)(2) applies to the statements allegedly made by Badau to Scrappost's subscribers,[5] Scrappost fails to advance any argument as to the out-of-court statements made by Scrappost's subscribers to Newman. In order for the subscribers' statements to be admissible, they must either be excluded from the hearsay definition or fall within a hearsay exception. The Court concludes that Newman's testimony–that he was told by subscribers that Badau called the subscribers and made defamatory statements about

---

[5] Badau's defamatory statements arguably fall outside the definition of hearsay because they are not being introduced for the truth of the matter asserted. This is especially true in the case of a defamation claim, where the plaintiff alleges that the defendants' statements are false.

10

Scrappost–contains inadmissible hearsay.

Third, Scrappost mischaracterizes Badau's testimony.  Even in a light most favorable to Scrappost, it is a far reach to interpret Badau as "not denying" that he made the defamatory statements alleged.  With respect to any conversations between Badau and Scrappost subscribers, Badau admitted that he called subscribers.  (Ex. K to Scrappost's Resp. at 66-68).  However, when Badau was specifically asked about the contents of his conversations and about the defamatory statements at issue, Badau testified that he could not recall making such statements.

Because Badau's testimony is non-committal–consisting of his inability to recall whether he made the defamatory statements–Scrappost fails to create a genuine issue of material fact. Other courts have similarly concluded that such testimony is insufficient to raise a genuine issue of material fact.  *See Smith v. LVNV Funding, LLC*, 2014 WL 4441195, at *1 n.1 (E.D. Tenn. Sept. 9, 2014) (noting that "testimony that the plaintiff does not remember" whether an event took place "does not amount to [a] sufficient denial[] to create a genuine issue of material fact"); *McBride v. Vill. of Michiana*, 1998 WL 276139, at *4 (W.D. Mich. April 2, 1998) (concluding that a witness's inability to "remember several important details" about a phone call "failed to create an issue of fact").  As such, Scrappost's business defamation claim fails.

**B.**    **Injurious Falsehood**

In Count II of its amended complaint, Scrappost asserts a claim for injurious falsehood. "Injurious falsehood was recognized as an actionable claim in Michigan in *Knollenberg v. Ramirez*, 127 Mich. App. 345 (1983).  *Neshawat v. Salem*, 173 F.3d 357, 362 (6th Cir. 1998). "The Michigan Court of Appeals essentially adopted the elements of injurious falsehood as set forth in the Restatement (Second) of Torts." *Id.*  The "gist of the tort is some interference with

11

an economically advantageous relationship which results in pecuniary loss rather than action that directly affects property." *Knollenberg*, 127 Mich. App. at 178. "Injurious falsehood cases typically concern derogatory or disparaging communications..." *Id.*

To support its injurious falsehood claim, Scrappost relies on the following statements allegedly made by Badau to Scrappost subscribers: (1) Scrappost was engaged in illegal conduct; (2) Scrappost members who were not IQ subscribers could not post on Scrappost's website; and (3) Peony filed several lawsuits against Scrappost. (Scrappost Resp. at 8). Scrappost argues that "with respect to the statements at issue ... Peony's Badau doesn't deny having" made these statements. (Scrappost's Resp. at 7). Scrappost concludes that these statements were false and that Peony's intent to harm Scrappost is apparent from the fact that Peony admitted that it established its IQ product as a direct response to Scrappost. (*Id*. at 8).

The Court concludes that Scrappost's injurious falsehood claim suffers from the same flaw as its business defamation claim. Namely, that there is no admissible evidence establishing that Badau made such statements to Scrappost's subscribers. Badau's testimony only establishes that he does not recall making these statements.

## C.   Tortious Interference with Business Expectancy

In Count III of its amended complaint, Scrappost alleges a claim for tortious interference. Scrappost argues that Peony tortiously interfered with Scrappost's subscriber relationships by (1) making defamatory statements to subscribers and (2) by fraudulently acquiring a Scrappost membership through Greentex, thereby accessing Scrappost's private listings and calling/harassing Scrappost's subscribers. (Scrappost Resp. at 10-11).

Under Michigan law, a plaintiff must establish the following elements to prevail on a

claim for tortious interference with business expectancy: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy has been disrupted.  *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc*., 323 F.3d 396, 404 (6th Cir. 2003).

The parties appear to dispute whether or not Scrappost can establish the third element. Specifically, Peony argues that Scrappost cannot establish that: (1) Peony's motives were improper; and (2) that Peony's actions caused any subscribers to terminate their relationships with Scrappost.  At this juncture, the Court concludes that issues of fact exist as to whether or not Peony's motives in interfering with Scrappost's business expectancies were proper and whether Peony's actions caused Scrappost to lose subscribers.

### 1.    Intentional Interference – Improper Motive

The third element of a tortious interference claim requires the plaintiff to demonstrate that the third party was induced to break off the business relationship "by an intentional act that is either: (1) wrongful per se; or (2) lawful, but done with malice and unjustified in law." *Via The Web Designs, LLC v. Beauticontrol Cosmetics, Inc.*, 148 Fed. App'x 483 (6th Cir. 2005) (citing *CMI Int'l, Inc. v. Internet Int'l Corp.*, 251 Mich. App. 125, 131 (2002)).  Under the latter instance, the plaintiff "necessarily must demonstrate, with specificity, affirmative acts by the [defendant] which corroborate the unlawful purpose of the interference." *Id.*

As a general matter, an act does not constitute improper motive or interference "[w]here the defendant's actions were motivated by legitimate business reasons." *BPS Clinical Labs. v.*

13

*Blue Cross & Blue Shield of Mich.*, 217 Mich. App. 687, 699 (1996) (per curiam).  "However, where a defendant's actions overreach the bounds of permissible interference and improperly sabotage the contractual agreements of others, a defendant is not immune from liability." *Kavanaugh v. VMC Indus., Inc.*, 2000 WL 33400199, at *3 (Mich. App. Nov. 21, 2000) (per curiam).  Importantly, "just because certain actions are taken 'with the intent that they inure to the personal or pecuniary benefit of the defendant cannot ... weave a broad and impenetrable blanket of immunity from liability for those actions.'" *Cranbrook Professional Bldg., LLC v. Pourcho*, 2005 WL 415678, at *3 (Mich. Ct. App. Feb. 22, 2005) (quoting *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 96 (1989)).

Here, Peony acknowledges that it had Greentex subscribe to Scrappost in order to enable Peony to monitor Scrappost's private listings.  Peony further admits that it made phone calls to certain subscribers until they removed their listings from Scrappost's website.  (Peony Br. at 8).  Despite these undisputed facts, Peony argues that Scrappost cannot establish improper motive since "Peony's actions in seeking to protect its exclusive listing agreement are motivated by a legitimate business purpose."  (Peony Br. at 10).  Specifically, Peony argues that it was justified in calling all of the IQ subscribers that were listing on Scrappost's website because these subscribers were in violation of the exclusivity provision governing their relationship with Peony.  Peony's argument is not persuasive.

Initially, the Court finds it worth noting that Peony deceitfully obtained access to the non-public portion of Scrappost's website without paying a subscription fee.  Peony then used its access to repeatedly call subscribers (who were also Peony subscribers) with the intent that the subscribers leave Scrappost.

14

To the extent that Peony argues that it was justified in taking these actions, this Court has previously noted that "the issue of justification is generally an issue for the jury." *SJF Material Handling, Inc. v. Motor City Scrap, Inc.*, 2009 WL 4950465, at *12 (E.D. Mich. Dec. 15, 2009).

Moreover, the Court concludes that reasonable jurors could disagree as to whether or not Peony's interference with Scrappost was actually motivated by legitimate business reasons or whether Peony used its exclusivity provision as a pretext to interfere with Scrappost's business relationships. The following undisputed facts make this a question of fact for the jury to resolve. First, Peony admits that the reason it created Peony IQ (and the exclusivity provision) is partly due to Scrappost coming into existence. Second, Peony admits that it never has, and does not intend to, enforce the exclusivity provision against any of its IQ subscribers. In other words, Peony will not take legal action against any subscriber that breaches this provision. Third, Peony admits that it called all Peony subscribers that were listing on Scrappost's site, not just Peony IQ subscribers.

### 2.    Causation

Peony also asserts that Scrappost cannot establish that Peony's interference caused subscribers to leave Scrappost because "[w]hile many of Scrappost's subscribers cancelled their subscriptions (or let them lapse)[,] there is no subscriber testimony as to why they did so." (*Id.* at 9). The Court is not persuaded. Taken in a light most favorable to Scrappost, the Court concludes that there exists sufficient evidence to create a dispute of fact as to whether Scrappost lost subscribers as a result of Peony's actions.

First, while it is true that Scrappost fails to offer testimony from former subscribers regarding why they stopped listing, it remains undisputed that Badau repeatedly called Scrappost

15

subscribers (that were also Peony subscribers) until these subscribers removed their prices from Scrappost's website. In fact, Peony concedes "that [Peony] told subscribers that because of the exclusive agreement, [the subscribers] could not list pricing on a similar publication." (Peony Br. at 8). This admission, coupled with the undisputed fact that Scrappost lost subscribers–who were listing on both sites–is sufficient to raise a dispute as to why the subscribers left.[6] Whether or not the inference in Scrappost's favor is strong is another question – one which involves weighing evidence and making credibility determinations.

As such, the Court concludes that there is sufficient evidence to raise a dispute of fact as to why the subscribers who were repeatedly called by Peony cancelled their Scrappost subscriptions.

**D.     Fraudulent Misrepresentation**

In Count IV of its amended complaint, Scrappost asserts a claim for fraudulent misrepresentation. Scrappost alleges that Peony made a fraudulent misrepresentation, which Scrappost relied upon to its detriment; namely, that "Peony fraudulently misrepresented its identity and the purpose of its Scrappost membership with the intention of inducing Scrappost to rely upon the representations and register Peony for a Scrappost membership." (Compl. at ¶ 52).

Under Michigan law, the elements of fraudulent misrepresentation are:

(1) That defendant made a material representation; (2) that it was false; (3) that

---

[6] Importantly, Peony's concession distinguishes the instant case from *SJF Material Handling, Inc. v. Motor City Scrap, Inc.*, wherein this Court held that the failure to offer testimony from a former customer as to why he stopped doing business with plaintiff rendered the plaintiff's tortious interference speculative. *SJF Material Handling*, WL 2009 4950465, at *10.

16

when he made it he knew that it was false, or made it recklessly, without any
knowledge of its truth, and as a positive assertion; (4) that he made it with the
intention that it should be acted upon by plaintiff; (5) that plaintiff acted in
reliance upon it; and (6) that he thereby suffered injury.

*Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976) (internal quotation

marks and citations omitted).  "An additional requirement for element five is that the plaintiffs'

reliance on the alleged misrepresentation must have been reasonable."  *MacDonald v. Thomas*

*M. Cooley Law School*, 724 F.3d 654, 662-63 (6th Cir. 2013) (internal citations omitted).

Scrappost's argument in support of its misrepresentation claim is not persuasive.

Scrappost has not identified any affirmative misrepresentation made by Peony.  There is no

evidence to support the allegation that Peony *itself* subscribed to Scrappost under the Greentex

alias, thereby misrepresenting its identity.  Nor has Scrappost pointed to any evidence

establishing that Peony misrepresented its identity and intentions in writing to Scrappost.

Instead, the evidence establishes that Peony asked Greentex to subscribe to Scrappost and

that Greentex subsequently sent Scrappost's private listings to Peony.  Scrappost has not

established how Peony's conduct, even if unethical, constitutes a material representation for

purposes of its fraudulent misrepresentation claim.  To the extent that Scrappost now argues that

Greentex acted as an agent of Peony and that Peony should be treated as though it made the

representations itself, this argument is asserted to in a perfunctory manner and Scrappost has not

supported this argument with any applicable case law.  As such, the Court concludes that

Scrappost's fraudulent misrepresentation claim fails.

**E.    Damages**

In its complaint, Scrappost alleges that Peony's actions have caused "significant damages

to Scrappost in lost revenue and lost customers."  (Compl. at ¶ 21).  In support of its claim for

damages, Scrappost offers the testimony of Robert Cell and a damages analysis (prepared by Cell), which details the effect of Peony's actions on Scrappost's valuation.

Peony argues that Scrappost's "lost value damages model is legally improper and speculative." (Peony Br. at 14). Specifically, Peony takes issue with: (1) Cell's testimony that Scrappost would have continued to grow at a rate equivalent to other "similar" businesses such that a valuation analysis is appropriate; (2) Cell's testimony that Scrappost would have continued to obtain new subscriptions in the absence of Peony's conduct; (3) Scrappost's failure to determine any alleged interference by Peony; and (4) Scrappost's disregard of other factors, which contributed to Scrappost's inability to obtain new subscribers/loss of existing subscribers. (Peony Br. at 15-17).

> Damage principles under Michigan law have been summarized as follows:
>
> The general rule is that remote, contingent, and speculative damages cannot be recovered in Michigan in a tort action. A plaintiff asserting a cause of action has the burden of proving damages with reasonable certainty, and damages predicated on speculation and conjecture are not recoverable. Damages, however, are not speculative simply because they cannot be ascertained with mathematical precision. Although the result may only be an approximation, it is sufficient if a reasonable basis for computation exists. Moreover, the law will not demand that a plaintiff show a higher degree of certainty than the nature of the case permits . . . . When the nature of a case permits only an estimation of damages or a part of the damages with certainty, it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount. Furthermore, the certainty requirement is relaxed where damages have been established but the amount of damages remains an open question. Questions regarding what damages may be reasonably anticipated are issues better left to the trier of fact.

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich. App. 83, 96 (2005) (internal quotation marks and citations omitted). "The type of uncertainty that will bar recovery of damages is 'uncertainty as to the fact of damage and not as to its amount.'" *Northwoods Mfg.*,

*Inc. v. Linsmeyer*, 2016 WL 3004419, at * 4 (Mich. App. May 24, 2016) (quoting *Bonelli v.*

*Volkswagen of America, Inc.*, 166 Mich. App. 483, 511 (1988)).

At this juncture, the Court does not believe that it should rule as a matter of law that

Scrappost's method of calculating damages is speculative and uncertain.[7]  As an initial matter,

the Court notes that disputes of fact exist as to whether or not Peony tortiously interfered with

Scrappost thereby causing damage.  If a jury concludes that Scrappost has been damaged as a

result of Peony's actions, Scrappost will be required to offer sufficient evidence from which a

jury could calculate the amount of such damage.

Here, Scrappost's valuation summary and Robert Cell's testimony identify damage

caused by the rate of churn (instances of subscription cancellations) experienced by Scrappost.

Cell testified that he approximated that Scrappost would have reached between 2,048 and 2,510

subscriptions had Scrappost not experienced the rate of churn that it did.  According to Cell,

Scrappost's annualized rate of subscription revenue decreased from a projection of $440,000 to

$178,000.  (Ex. I to Scrappost Resp. at 13).  Cell based his projection of Scrappost's expected

growth by comparing the valuation of other companies in the subscription business.  Cell further

testified as to the method of valuing subscriptions for companies in the software as a

subscription business:

> But you take into the value of the subscription.  How long it should go.  So if
> churn is five percent, it would be a 20-year life on average.  If it's 10 percent, it's
> 10-year life.  And the gross profit of that.  And then the cost to acquire those
> companies to get more of them to try and determine valuation.

---

[7] To the extent that Peony argues that Scrappost has abandoned a damage model based on
actual lost revenue or lost profits, Scrappost has not made this assertion.  And while Robert Cell
testified as to the diminution in Scrappost's value, Peony disregards other testimony regarding
lost subscription revenue.

(Ex. G. To Scrappost Resp. at 69).  As a result of its loss in subscription revenue, Scrappost's value in May 2016 was $21,888 as opposed to what it could have been–between $11,967,839 and $18,643,432–had it continued to grow without interference.  (Ex. H to Scrappost Resp.).

Peony fails to explain how Scrappost's method for calculating damages is speculative. Instead, Peony's arguments pertain largely to the weight and credibility of the evidence offered in support of Scrappost's damages claim.  For example, Peony takes issue with Cell's valuation analysis.  Peony argues that Scrappost speculates as to the hypothetical growth of its business. Peony claims that its alleged interference had nothing to do with Scrappost's ability to acquire new subscribers.  In making this argument, Peony misses the mark.  Peony is merely pointing out issues of fact, *i.e.*, whether Peony's actions affected Scrappost's ability to acquire new subscribers.

Peony similarly claims that "Scrappost has the burden to prove that but for the alleged interference, it would have continued growing.  If it cannot determine the level of alleged interference, then any valuation analysis based on Peony's conduct is pure speculation."  (Peony Br. at 17).  This argument suffers from the same flaw as the one above: it pertains to disputes of fact.

Peony also argues that "the valuation model is based on subscription models from other unidentified companies for which no analysis has been done to see if comparable to Scrappost." (Peony Br. at 16).  This argument pertains to credibility rather than the speculative nature of ascertaining damages.  At trial, Peony may offer evidence to rebut Cell's testimony regarding the similarities between Scrappost and the companies cited to in Scrappost's valuation summary.

Peony further argues that "Scrappost's analysis ignores other factors which contributed to

20

the inability to obtain new subscribers or the loss of existing subscribers." (Peony Br. at 17).

Again, Peony focuses on issues of fact. These arguments can be raised by Peony at trial.

## CONCLUSION

For the foregoing reasons, the Court shall **GRANT IN PART** and **DENY IN PART**

Peony's Motion for Summary Judgment. Peony's motion is **GRANTED** to the extent that it

seeks dismissal of Scrappost's Count I (Business Defamation), Count II (Injurious Falsehood),

and Count IV (Fraudulent Misrepresentation). Peony's motion is **DENIED** to the extent that it

seeks dismissal of Scrappost's Count III (Tortious Interference with Business Expectancy).

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  March 24, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on
March 24, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager

21